IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE:<br>VANTAGE DRILLING INTERNATIONAL<br>(f/k/a OFFSHORE GROUP INVESTMENT<br>LIMITED), *et al.*,<br><br>               Debtors. | )<br>)<br>)<br>)<br>)<br>) | Chapter 11<br>Bankr. Case No. 15-12422 (BLS)<br>(Jointly Administered) |
| HSIN CHI SU and F3 CAPITAL,<br><br>               Appellants,<br><br>             v.<br><br>OFFSHORE GROUP INVESTMENT<br>LIMITED, *et al.*,<br><br>               Appellees. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 16-047 (MN)<br>C.A. No. 16-048 (MN) |

## <u>MEMORANDUM OPINION</u>

This dispute arose in the Chapter 11 cases of debtor Offshore Group Investment Limited ("OGIL"), now known as Vantage Drilling International ("VDI"), and its affiliated debtors (together, the "Company"). Before the Court are the related appeals of Hsin Chi Su a/k/a Nobu Su ("Su") and F3 Capital ("F3") (collectively, "Appellants") from (i) a January 14, 2016 oral ruling by the Bankruptcy Court that Appellants lacked standing (B.D.I. 214)[1] ("Standing Order") to object to confirmation of the Company's joint prepackaged plan of reorganization (B.D.I. 166) ("Plan"); and (ii) the Bankruptcy Court's January 15, 2016 order confirming the Plan (B.D.I. 188) ("Confirmation Order"). For the reasons set forth herein, the Standing Order and the Confirmation Order are affirmed.

---

[1] The docket of the Chapter 11 cases, captioned *In re Vantage Drilling Int'l,* Case No. 15-12422-BLS (Bankr. D. Del.) is cited herein as "B.D.I. __." A final decree in the Chapter 11 cases was granted on March 3, 2017 (B.D.I. 342), and the cases were closed on July 17, 2017.

I.    **BACKGROUND**

   A.    **The Company and Prepetition Litigation with Appellants**

   The Company is an international offshore drilling company that operates a fleet of drilling

units around the world.  (B.D.I. 17 ("First Day Decl.") ¶ 18).  The Company's principal business

is to contract its fleet, related equipment, and work crews to drill underwater wells for companies

that explore and produce oil and natural gas.  (*See id.*).  Prior to the Company's Chapter 11 filing,

the Company's drilling fleet was owned and operated by OGIL, which was a direct, wholly owned

subsidiary of non-debtor Vantage Drilling Corporation ("Vantage").  (*Id.* ¶ 28).  Vantage was a

Cayman Islands exempt company whose shares were publicly traded on NYSE MKT LLC.  (*Id.*

¶ 30).  Vantage acquired the Company in June 2008 from F3, an entity wholly owned by Su.

(*Id.* ¶ 28).  In connection with the acquisition, F3 became the largest shareholder of Vantage and

controlled several seats on Vantage's board of directors.  (B.D.I. 8 ("Disclosure Statement") at

§ V(B)(2)(a)).

   The relationship between Su and Vantage deteriorated after the failure of a joint venture.

Under the related joint venture agreement, Su had acquired additional equity interests in Vantage

and committed to make payments to fund construction of a drilling rig.  The Company contends

that Su failed to honor his obligations.  Thereafter, according to the Company, Vantage bought out

Su's interest in the joint venture by issuing a promissory note to F3, and Su resigned from the

Vantage board. (*Id.*).  In August 2012, Vantage brought litigation against Su in Texas state court,

seeking to recover the shares issued to F3 in connection with the joint venture, cancel the

promissory note issued to F3, and recover actual and punitive damages on the alleged grounds that

Su made material misrepresentations concerning the payment terms for the construction of the rig

and his ability to satisfy the financial obligations under the agreement.  *See generally, Hsin-Chi-*

*Su v. Vantage Drilling Co*., 474 S.W.3d 284, 288-92 (Tex. App. 2015).  In June 2014, Su filed a

counterclaim against Vantage seeking monetary damages in excess of $2 billion.  (Disclosure

Statement, Ex. 2 ¶ 1).[2]  At the time of the Company's bankruptcy filing, the Texas state litigation

was still pending.[3]

###### B.      RSA and Prepackaged Joint Plan of Reorganization

The Company's financial difficulties in 2014 were precipitated by a drop in oil prices, a

corresponding decline in demand for the Company's services, and termination of a long-term

contract by the Company's most significant customer.  (*See* First Day Decl. ¶ 6; D.I. 16 at 2).  The

Company retained restructuring advisors and engaged key secured creditors in negotiations

regarding a consensual restructuring.  (First Day Decl. ¶¶ 7-13).  Seeking to minimize any risk of

disruption in the Company's business, on December 1, 2015, the Company entered into a

---

[2]     Su disputes the Company's characterization of the parties' prior business dealings and the progress of the Texas state court litigation, *see* D.I. 18 at 9-11, none of which is relevant to the Court's consideration of the issues raised in this appeal.

[3]     A related action for declaratory relief is currently pending before this Court, captioned *Hsin-Chi Su v. Vantage Drilling Int'l*, No. 19-43-MN (D. Del.).  The complaint filed by Appellants in that action indicates that a settlement agreement, dated May 17, 2017, was approved by the Cayman Court in June of 2017, between and among Appellants, Vantage (in official liquidation), and the liquidators appointed in the Cayman proceedings discussed *infra*.  (*Id.,* D.I. 1 ¶ 7).  The Complaint alleges that the settlement agreement preserved certain claims of Appellants against VDI.  (*Id*.).  The Complaint alleges that, in June 2018, VDI (through two of its subsidiaries) obtained an award in the approximate amount of $622 million against Petrobras America, Inc. and certain related entities (together "Petrobras") in an arbitration conducted by the International Center for Dispute Resolution of the American Arbitration Association, captioned *Vantage Deepwater Co., et al. v. Petrobras America, et al.*, No. 01-15-0004-8503.  (*Id*. ¶ 12).  The Complaint further alleges that the arbitration award was based on Petrobras' wrongful termination of a contract with OGIL, and that Appellants have a pecuniary interest in the proceeds of the arbitration award.  (*Id*. ¶ 14).  The Complaint seeks declaratory relief that Appellants' claims against VDI were neither released by the Plan nor enjoined by the Confirmation Order.  (*Id*. ¶ 21).

Restructuring Support Agreement ("RSA") with Vantage, holders of more than two-thirds of

OGIL's revolving loans, and holders of 59% of OGIL's other secured indebtedness. (*Id.* ¶ 58).

The RSA contemplated that the restructuring would occur through a prepackaged plan of

reorganization – *i.e.*, one for which votes would be solicited before the filing of the bankruptcy

petition. (*Id.*, Ex. 2 at 2). The RSA also provided that, while the Company would reorganize

under Chapter 11 of the Bankruptcy Code, non-debtor parent Vantage would separately liquidate

in a Cayman Islands proceeding. (*Id.*). Under the RSA, the Company further agreed to use

commercially reasonable efforts to obtain court approval of the plan within 60 days of the

bankruptcy filing. (*Id.*). The RSA further provided that, prior to the petition date, OGIL would

purchase Vantage's equity interests in two subsidiaries. The Company asserts this was necessary

to avoid minimize operational disruption and enhance efficiencies after the Company's emergence

from bankruptcy, as these subsidiaries provided "significant management, personnel, payroll, and

other services to the Company." (First Day Decl. ¶¶ 65-66). OGIL issued a secured promissory

note to Vantage as consideration for the service subsidiaries. (*Id.*).

The Company filed Chapter 11 on December 3, 2015 ("Petition Date") and entered

bankruptcy with a proposed plan in place accepted by holders of 100% of claims arising from

OGIL's revolving loans and holders of 98.8% of OGIL's other secured indebtedness. (B.D.I. 168

("Plan Decl.") ¶ 57). The proposed plan provided that Vantage would receive new equity in the

reorganized Company on account of the promissory note. (*Id.*). The proposed plan also contained

standard release and exculpation provisions covering the Company, Vantage, fiduciaries of the

bankruptcy estate, and creditors who voted to accept the Plan. (Plan §§ 10.7, 10.8). The proposed

plan made clear that Su and F3 were not covered by the release and exculpation provisions, as

Vantage's claims against Su and F3 were still pending in Texas state court. (*Id.*). The proposed

plan also provided, however, that it would have no effect on any party's rights or claims in connection with the Cayman Islands liquidation of Vantage. (*See* Plan at §§ 5.3, 10.7 & 10.12). Thus, while all of Vantage's rights against Su and F3 were preserved, so too were Su and F3's rights against Vantage.

Also on the Petition Date, Wells Fargo Bank, N.A. ("Wells Fargo"), as a creditor of Vantage, filed a petition in the Cayman Islands Grand Court ("Cayman Court") seeking an order that Vantage be placed into compulsory liquidation. (B.D.I. 174 ("Eldridge Decl.") ¶¶ 9-15). Consistent with Cayman law, Wells Fargo nominated independent professional liquidators to manage the winding up of Vantage, subject to the supervision of the Cayman Court. (*Id*. ¶ 15).

### C.     Plan Objection and Confirmation Order

On January 12, 2016, Appellants filed their objection to confirmation of the plan, arguing, *inter alia*, that Vantage was not properly authorized by its board to enter into the RSA and participate in the Company's reorganization (B.D.I. 173) ("Objection"). Theirs was the only objection that was not withdrawn prior to the confirmation hearing. The Company filed a reply to the Objection (B.D.I. 175) challenging the standing of Su and F3 to be heard in the Chapter 11 proceeding. The same day they filed their Objection, Appellants also filed a "notice" on the Bankruptcy Court docket which stated that F3 had "filed an Ex Parte Application seeking an injunction in the Cayman Islands against Vantage Drilling Company." (B.D.I. 183). According to Appellants, the purpose of the requested injunction was to prevent Vantage from participating in "acts that are required by the plan," such that the process of consummating the plan "could not continue." (B.D.I. 214 at 7:9-14).

On January 14, 2016, the Bankruptcy Court held a hearing to consider plan confirmation and Appellants' standing to object. Regarding the Objection, the Bankruptcy Court concluded that

"Mr. Su and F3 do not have standing to appear and be heard in this proceeding." (*Id*. at 73:18-20). In reaching this determination, the Bankruptcy Court started from the "axiomatic proposition" that F3 is a "shareholder of a shareholder of a debtor. That shareholder of the debtor [Vantage] is not a debtor before this court." (*Id*. at 73:22-74:1). Thus, "[a]ny connection between Mr. Su and F3 and its debtors [is] to[o] attenuated to apply the predicate for standing to appear and be heard and object in this court." (*Id*. at 75:8-11).

The Bankruptcy Court emphasized, however, that its ruling would not preclude Su and F3 from seeking relief in the appropriate forum. The Bankruptcy Court observed that "substantially all of the concerns and issues that have been raised by and argued by [Appellants' counsel] today are properly addressed to the Caymans court." (*Id*. at 75:12-16). Specifically, the Bankruptcy Court observed that any allegations that Vantage was not authorized to consent to the restructuring transactions were "properly addressed to the Caymans court" overseeing Vantage's liquidation (*id*. at 75:12-16), thus leaving open the possibility that Su and F3 could obtain a decree in the Cayman court that might "affect the Debtor's ability to move forward with a plan" (*id*. at 18:8-21).

Regarding Appellants' request for adjournment of the confirmation hearing pending *ex parte* application filed in the Cayman Islands proceeding, the Bankruptcy Court considered and denied that request. (*Id*. at 16:1-3). The Bankruptcy Court noted that "[t]here are other proceedings elsewhere that may impact or may not impact whether or not th[e] plan goes effective or how that process plays out, but that is not currently a consideration before me." (*Id*. at 16:21-17:1). In light of the concern that an immediate closing might moot any challenge Su and F3 had to Vantage's participation in the restructuring transaction, the Bankruptcy Court asked the Company's counsel whether the Company intended to consummate the plan immediately after

entry of a confirmation order. (*Id.* at 9:22-24). The Company represented that the parties were not in a position to close immediately, which the Bankruptcy Court considered and accepted. (*Id.* at 10:1-4 (counsel's representation); 78:13-23 ("I have asked and been advised, as my instincts would indicate, that the Debtor is not going to go effective on this large and complex restructuring this afternoon or tomorrow."); 17:13-18:1 (same). The Bankruptcy Court considered the fact that "there will be proceedings perhaps as soon as this afternoon in the Cayman Islands regarding the parent [Vantage's] proceedings" (*id.* at 74:5-9) and noted "it is my expectation that if there are proceedings in the Cayman Islands that would affect how the Debtor may move forward with the reorganization that is subject to my review today, then we may have further proceedings in this court. And we would be so advised, and I would be guided by the parties." (*Id.* at 78:17-23). Based on a measure of business urgency of moving forward with plan confirmation, and the conclusion that adjournment would not serve any meaningful purpose (*see id.* at 17:4-12), however, the Bankruptcy Court denied the request for adjournment and proceeded to determine whether the plan was confirmable. (*See id.* at 79:5-97:9).

Regarding confirmation, the Bankruptcy Court ruled that "the Debtors have carried their burden with respect to the relief requested, and I will be prepared to enter an order confirming the plan." (*Id.* at 92:21-93:1). The Bankruptcy Court addressed the concerns expressed by Appellants regarding "the pace of this proceeding," and noted that "the business realities require[d] prompt consideration in order to stabilize the business, that, by all accounts, is well managed, well run, and well operated and just trying to deal with . . . a starkly challenging business environment." (*Id.* at 96:18-24). On January 15, 2016, the Bankruptcy Court entered the Confirmation Order. The findings and conclusions contained in the Confirmation Order addressed each of the requirements of § 1129 of the Bankruptcy Code and also contained findings that the release and

exculpation provisions in the Plan were "fair, equitable, reasonable, and in the best interests of the Debtors and the Reorganized Debtors and their estates, creditors and equity holders." (B.D.I. 188 ¶ II). The Confirmation Order further provides that: "Nothing in the Prepackaged Plan or in this Order shall affect any party's rights against Vantage Parent or its nondebtor subsidiaries or affiliates . . . in connection with the Cayman Proceeding." (*Id.* ¶ 17).

On January 28, 2016, Appellants filed a timely notice of appeal with respect to both the Standing Order (C.A. No. 16-47-MN, D.I. 1) and the Confirmation Order (C.A. No. 16-48-MN, D.I. 1). Appellants did not seek a stay pending appeal. On June 22, 2016, the Court entered an Order consolidating the appeals under C.A. No. 16-47-MN. The appeals are fully briefed. Oral argument was not requested by either party.

## II.  JURISDICTION AND STANDARDS OF REVIEW

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). On appeal from a bankruptcy court's order confirming a Chapter 11 plan of reorganization, findings of fact are reviewed *de novo* for clear error and conclusions of law. *In re W.R. Grace & Co.*, 475 B.R. 34, 75 (D. Del. 2012), *aff'd,* 729 F.3d 311, 332 (3d Cir. 2013). Whether Su and F3 had standing to object to plan confirmation is a legal conclusion subject to *de novo* review. *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011).

## III.  ANALYSIS

### A.  Standing Order

The Bankruptcy Court determined that Su and F3, as shareholders of non-debtor Vantage, did not have standing to be heard in the Chapter 11 proceeding. (*See* B.D.I. 214 at 73:18-20). Status as a party in interest is particularly relevant here because the Bankruptcy Code expressly

provides that parties in interest "may object to confirmation of a plan." 11 U.S.C. § 1128(b).

Appellants argue that they were improperly denied standing to object to confirmation of the Plan

and should have been granted standing on the basis of (i) their alleged interest in the *res* of the

bankruptcy estate by virtue of their litigation against Vantage; (ii) alleged causes of action against

the Company for aiding and abetting shareholder oppression; and (iii) the Plan's unfair

discrimination in the form of exculpations and releases which exclude Appellants. (*See* D.I. 15 at

16-24). The Company counters that the Bankruptcy Court's decision on standing was consistent

with decisions holding that a shareholder of a shareholder of a debtor has too remote an interest in

the debtor's bankruptcy proceeding to have standing. (D.I. 16 at 23-32).

The Third Circuit has instructed that, "[t]o object to the confirmation of a reorganization

plan in bankruptcy court, a party must, in the first instance, meet the requirements for standing that

litigants in all federal cases face under Article III of the Constitution." *Global*, 645 F.3d at 210.

That is, a party must demonstrate that confirmation of the plan would cause it to suffer an "injury

in fact" that is "concrete," "distinct and palpable," and "actual or imminent." *Id*. (quoting

*Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Additionally, the party must establish that its

purported injury "fairly can be traced to the challenged action" and is likely to be "redressed by a

favorable decision." *Id.*

Standing in bankruptcy cases is also governed by § 1109 of the Bankruptcy Code, which

provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an

equity security holders' committee, a creditor, an equity security holder,[4] or any indenture trustee,

may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C.

---

4     An equity security holder in this context is a *debtor's* equity security holder. *See* 11 U.S.C.
      § 101(17) ("The term 'equity security holder' means holder of an equity security of the
      debtor.").

9

§ 1109(b). The list of potential parties in interest contained in § 1109(b) is not exclusive. *Global*, 645 F.3d at 210. Rather, that section "has been construed to create a broad right of participation in Chapter 11 cases." *In re Combustion Eng'g, Inc*., 391 F.3d 190, 214 n. 21 (3d Cir. 2004). The Third Circuit has defined "party in interest" as one who "has a sufficient stake in the proceeding so as to require representation." *Id*. at 210 (quoting *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985)). As a "helpful amplification" of this definition, the Third Circuit has adopted the Seventh Circuit's test, which defines a party in interest as "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992).

The Bankruptcy Court's analysis is consistent with the standard adopted by the Third Circuit. The Bankruptcy Court noted at the outset of its analysis that "bankruptcy standing is a threshold requirement, as standing is for all federal courts, but bankruptcy standing is its own particular breed of standing." (B.D.I. 214 at 74:10-13). Bankruptcy standing requires a "statement of or identification of a pecuniary or an economic or property interest before this court that is susceptible to redress and as to which parties should be able and afforded an opportunity to address the Bankruptcy Court." (*Id*. at 74:14-18). The question before the Bankruptcy Court was whether Appellants had demonstrated some injury-in-fact, *i.e.*, some specific, identifiable trifle of injury, or personal stake in the outcome of the litigation that is fairly traceable to the Plan. *See Global*, 645 F.3d at 211.

Here, standing was properly denied as Appellants did not identify a pecuniary interest that was susceptible to redress by the Bankruptcy Court. Appellants had no claim against or equity interests in the Company. F3 was a shareholder of Vantage, an entity which was not a debtor in the Chapter 11 proceeding. To the extent that confirmation of the Plan would have had any effect

on Appellants, therefore, it would be derivative of Vantage's status as a shareholder of OGIL. Case law is clear that "[p]arty in interest standing under § 1109(b) does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding." *See Krys v. Official Comm. of Unsecured Creditors (In re Refco, Inc.)*, 505 F.3d 109, 117 & n.10 (2d Cir. 2007).

The Court agrees with the Company that the Second Circuit's decision in *Refco* is directly on point. There, investors in a Cayman Islands company called Spinx objected to a settlement between Spinx and Refco that was presented for approval in Refco's bankruptcy. Affirming the lower courts' determinations that the investors in Spinx lacked standing to object in the bankruptcy case, the Second Circuit held that "[t]o the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else." *Refco*, 505 F.3d at 117. "By investing in Sphinx, Investors placed control of their funds entirely within the hands of Sphinx directors . . . Only Sphinx, not Individual Investors, could assert a claim against the Refco estate" or "negotiate a settlement with the Committee." *Id.* Thus, while investors "maintain[ed] a financial 'interest' in Spinx," they did not qualify as parties in interest within the meaning of the Bankruptcy Code. *Id.* Rather, "[t]he party in interest in the bankruptcy sense representing the Investors' financial interest, [was] Spinx." *Id.*

The same reasoning applies here. It was not the province of the Bankruptcy Court to resolve disputes among non-debtors – *i.e.*, between Vantage's shareholders and Vantage's officers and directors. Rather, any such claims belonged in the Cayman Court overseeing Vantage's liquidation. As the Bankruptcy Court correctly held, any allegations by Appellants that Vantage had been mismanaged did not endow them with standing to object in the Company's Chapter 11 case.

Additionally, as the Company points out, the realities of the Company's financial condition further support Appellants' lack of standing. (D.I. 16 at 29). It is uncontested that the value of the Company's assets was only $1.1 to $1.3 billion – far less than the face amount of the $2.6 billion indebtedness. (*See* B.D.I. 169 ("Aebersold Decl.") ¶ 10). It is therefore undisputed that the Company did not have sufficient assets to make distributions to Vantage on account of its equity interests in OGIL. Since Vantage's equity in OGIL was "out of the money," confirmation of the Plan could not have caused injury to Appellants, let alone subject them to harm that was "concrete," "palpable," or "imminent."

### 1. Interest in the *Res*

On appeal, Appellants argue that the Bankruptcy Court erred in entering the Standing Order because they were engaged in litigation with Vantage that "relates to *res* involved in the bankruptcy" and that "refers to the hard assets involved in the bankruptcy." (D.I. 15 at 10). Appellants refer to the Texas state court action, seeking a constructive trust over F3's shares in Vantage and a $60 million promissory note, and Su's assertion of a counterclaim related to the same assets. According to Appellants, the cornerstone of the RSA was a "diminution of the value of Vantage" and Appellants had a "direct interest" in the transfer of any property of non-debtor Vantage to the Debtor subsidiaries. (*Id.* at 10-11). The Company counters that, just because Appellants may have had unresolved tort claims against non-debtor Vantage, this did not give them an interest in the bankruptcy estates of Vantage's *subsidiaries.* (D.I. 16 at 29-31).

The Court agrees. The *res* of the Company's Chapter 11 proceeding was the property of the Company's estate, which included "all legal or equitable interests *of the debtor* in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (emphasis added). Appellants' counterclaim in the Texas state court action does not assert that Appellants have a property interest

in any of the Company's assets. Rather, the counterclaim seeks damages and monetary relief against Vantage. (*See* B.D.I. 175-2, Ex. B at 28). It is clear under prevailing case law that holding a damages claim against a shareholder of a Chapter 11 debtor – that is, being a creditor of a shareholder – does not give rise to standing in the debtor's bankruptcy. *See Refco*, 505 F.3d at 117.

This analysis is not changed by the fact that Appellants' lawsuit against Vantage "refers" to events that involved the Company or its vessels. (*See* D.I. 15 at 11). Appellants appear to suggest that they will have a right to the "hard assets" that were administered in the bankruptcy if they are successful in the Texas state court litigation. (*See id.* at 10). This argument ignores the fact that OGIL and Vantage are separate entities, and a claim against Vantage is not the same as a claim against the Company. The argument further ignores, as the Company points out, that asserting a claim for monetary damages does not give a plaintiff a property interest in defendant's assets. *See generally, Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 309 (1999) (holding pre-judgment unsecured creditor does not have sufficient property interest in debtor's property to obtain injunction restricting debtor's use or disposition of assets).

Finally, Appellants cite a provision in the Disclosure Statement filed in connection with the Plan which indicates to parties in interest the possibility that Su may assert claims against the Company. (*See* D.I. 15 at 18). Citing the *Amatex* decision, Appellants argue standing based on the fact that "future claimants are sufficiently affected by the reorganization proceedings to require some voice in them." (*Id.*). In *Amatex*, however, the Third Circuit held that future asbestos victims with "cognizable claims, albeit unliquidated, unmatured and contingent claims" against a debtor had standing in the debtor's bankruptcy case. *Amatex*, 755 F.2d at 1043. Unlike the tort claimants in *Amatex*, Su never asserted any claim against the Company. Even if Su had, as the Company

correctly asserts, this would not establish that Plan confirmation caused an injury to Su, as the Plan expressly provides that "[t]he legal, equitable, and contractual rights of holders of General Unsecured Claims" against the Company – such as tort claimants – "are unaltered by the Plan." (B.D.I. 166-1, Plan at § 4.5).

### 2. Allegations of Oppressive Conduct Against F3

Appellants argue that the Company aided and abetted Vantage's management in "oppression" of shareholders, including F3. (*See* D.I. 15 at 11-12). Appellants assert that the Company assisted Vantage in entering into an improper RSA, which provided for a voluntary winding up petition to be filed by Vantage in the Cayman Islands. (*See id.*). Appellants argue that such a provision was contrary to Cayman Islands law, which requires a shareholder vote or resolution. (*See id.* at 12). On this basis, Su and F3 contend that Vantage and the Company have engaged in oppression of F3. As the Company's management was headquartered in Houston, Texas, and recent Texas caselaw recognizes a cause of action for shareholder oppression, Appellants argue that the Company's efforts to assist Vantage in entering the RSA give rise under Texas law to a cause of action for aiding and abetting shareholder oppression. (*See* D.I. 15 at 12).

The Court rejects this argument. First, it ignores the undisputed fact that Vantage's liquidation proceeding was not commenced through a voluntary petition requiring shareholder approval. Rather, it was commenced by Wells Fargo, a creditor of Vantage, in accordance with Cayman Islands law. The Court agrees with the Company that Appellants' oppression argument is simply a different spin on their claim that they were victims of mismanagement and breaches of fiduciary duty. As the Bankruptcy Court correctly held, whether Vantage's management engaged in any misconduct toward its shareholders was an issue to be addressed by the Cayman Court, not the Bankruptcy Court. (*See* B.D.I. 214 at 75:12-16; *see also Refco*, 505 F.3d at 118).

### 3. Unfair Discrimination Under the Plan

Su further asserts that he had standing to object to the Plan based on the Company's last-minute amendments to the Plan which had the effect of excluding him from the parties to be exculpated and released thereunder. (*See* D.I. 15 at 13-15; D.I. 18 at 11-12). Su argues that it was well established that he was a fiduciary of OGIL, as he executed contracts in such capacity for OGIL, and that the Plan treats him differently from other like parties by excluding him from exculpation and release. (D.I. 15 at 13 (citing B.D.I. 173-1 at 23)). Su argues that this constitutes unfair discrimination and gave rise to his standing to object to the Plan. (*See id.* at 13). According to the Company, Su's standing argument misses the mark because Su had no legal entitlement to be released or exculpated that could give rise to standing to object to confirmation. (*See* D.I. 16 at 37). The Company asserts that the existence of the ongoing litigation between Vantage and Su was the predominant reason that Su was expressly carved out from the release provisions in the Plan, and that "Vantage, as one of the parties that provided releases, was well within its right to decline to release Su. Nor could the plan have required Vantage to grant a release." (*Id.*). Appellants' reply asserts that this appeal is the first time the Company has alleged that the Plan was amended for the benefit of Vantage to the detriment of Su and F3, and these representations should have been disclosed to the Court, creditors, and all parties in interest. (D.I. 18 at 3).

Appellants' unfair discrimination argument must be rejected. As the Company correctly points out, no provision of the Bankruptcy Code or other body of law requires a Chapter 11 plan to provide a release or exculpation provision to anyone in particular – let alone a party that is making no contribution to the bankruptcy estate. Courts have held that exculpation clauses, which excuse liability for future acts relating to consummation of a plan, "should be limited to *fiduciaries who have served during the chapter 11 proceedings*: estate professionals, committees and their

members, and the debtors' directors and officers." *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (emphasis added). It is undisputed that Su did not serve as a fiduciary of any debtor during the Chapter 11 case and that he was never a director or officer of the Debtors. (B.D.I. 214 at 24:3-5). With respect to the release provisions, which waive liability for past conduct, there is no legal requirement that any particular person be released under a plan. Rather, courts have placed numerous restrictions on the circumstances in which releases can be approved under Chapter 11.[5] As Su had no legal entitlement to a release or exculpation, his exclusion from these Plan provisions did not endow him with standing to object.

Appellants also cite the "reservation of rights provided to the United States which were not provided to Su and F3" which provides that the Plan's releases "would not operate as a release or discharge of … any Claim of the United States government or any of its agencies." (Plan, § 10.7(b)). It is unclear, however, why Appellants believe that the inclusion of this clause was "discriminatory." The term "Claim" is defined in the Plan as a claim "against any Debtor." (*Id.* at § 10). The clause that Appellants highlight therefore merely clarifies that the U.S. government

---

[5]     As the Company correctly points out, whether a debtor can provide a release requires consideration of, *inter alia*, whether the released party has made a "substantial contribution" of assets to the reorganization, and whether the release is essential to the success of the reorganization. *See Indianapolis Downs*, 486 B.R. at 303 (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999). Similarly releases by non-debtors, like Vantage, will be approved only when, for example, they are granted consensually, or where the release is given in exchange for substantial consideration or otherwise is necessary to the success of the plan. *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). Thus, a plan cannot require that a release be given to any person for any reason. Rather, a person receiving a release generally must have provided something of value in return, such as by contributing assets to the estate or otherwise facilitating the debtor's reorganization. Neither can be said of Appellants in these Chapter 11 cases. Unlike the parties released under the Plan, Su was actively engaged in litigation against the Company's parent and seeking more than $2 billion in damages.

was not releasing any claims it held *against the Company*. The inclusion of this clause had no effect on Appellants that would give rise to standing.

Finally, Su asserts he had standing to object to the Plan based on the final clause of the Plan's release provision, which states that "nothing in this Plan shall affect any party's rights against Vantage Parent or its nondebtor subsidiaries and affiliates . . . under any applicable document (including in connection with the Cayman Proceeding)." (Plan, § 10.7(b)). This provision made clear that Appellants' rights were unaffected by the Plan in the Cayman Islands Proceeding, *i.e.*, the proceeding in which Appellants *have* standing. The Court does not see how inclusion of such a provision in the Plan could have caused any injury to Appellants.

## B. Confirmation Order

As Appellants lacked standing to object to the Plan, the Court need not address the merits of Appellants' objections to plan confirmation. It appears, however, that the substance of that objection is identical to the substance of Su and F3's claims concerning standing, and thus they can be rejected for the same reasons. (*See* D.I. 15 at 20 (objecting to "discriminatory treatment" under the exculpation and release provisions); *id.* at 21 (objecting on the basis that Vantage's consent was the product of mismanagement)). Appellants offer no basis for this Court to second guess the Bankruptcy Court's detailed findings and conclusions regarding the Plan's satisfaction of the requirements of § 1129 of the Bankruptcy Code.

The only additional argument that Appellants appear to have raised on appeal is that the Bankruptcy Court lacked subject matter jurisdiction to approve the Plan because it involved the "disposition" of Vantage's property. This argument must be rejected. Appellants have offered no evidence that the Plan administered assets belonging to Vantage; rather, the Plan administered the assets of the Company, a legal entity distinct from Vantage. While the Plan involved the

cancellation of Vantage's shares of OGIL, and the distribution to creditors of new shares in the reorganized Company, this is something the Bankruptcy Court unquestionably had authority to approve. Under the Bankruptcy Code, as the Company correctly points out, a plan may "impair" – *i.e.*, alter the legal rights of – any class of equity interests in a debtor. 11 U.S.C. § 1123(b).

Appellants' reliance on the *TMT Procurement* case is misplaced. (D.I. 15 at 21-23 (citing *In re TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512 (5th Cir. 2014)). In that case, companies owned by Su filed for bankruptcy, and Su offered to pledge F3's shares in Vantage as collateral for post-petition financing. Vantage, which was seeking in the Texas state court litigation to rescind and impose a constructive trust over the shares it issued to F3, objected to the proposed pledge on the ground that the shares were not property of the debtors' estates, and that the bankruptcy court therefore lacked jurisdiction over them. *Id*. at 516-17. The Fifth Circuit agreed. *Id*. at 528. Here, unlike in *TMT*, the Company's Plan does not purport to dispose of or encumber any property belonging to a non-debtor. Rather, it readjusts the rights of creditors and equity holders of the debtors – the *sine qua non* of a Chapter 11 plan – including the rights held by Vantage on account of its equity interests in OGIL. (*See* Plan at § 4).

Finally, Appellants cite the *Combustion Engineering* case, which addressed whether a federal court had jurisdiction to issue an injunction in a plan barring a claim by one non-debtor against another. *See Combustion Eng'g*, 391 F.3d at 224. Here, however, the Plan did not purport to affect or adjudicate any claims Su or F3 might have against a non-debtor. To the contrary, the Plan expressly preserved all claims that any party might have against Vantage, including in the Cayman proceeding. (*See* Confirmation Order ¶ 17).

## IV.    CONCLUSION

For the reasons set forth herein, the Standing Order and Confirmation Order are affirmed. Having determined that those orders should be affirmed on the merits, the Court does not consider the additional arguments raised by the Company regarding equitable mootness.  (*See* D.I. 16 at 18-25).  A separate Order will be entered.

June 21, 2019

The Honorable Maryellen Noreika
United States District Judge